UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BEBI ALLI, et al. | : | CIVIL CASE NO. |
|     Plaintiffs, | : | 3:10-cv-4 (JCH) |
| | : | |
| v. | : | |
| | : | |
| BOSTON MARKET CO., | : | SEPTEMBER 8, 2011 |
|     Defendant. | : | |

**RULING RE: PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION
(DOC. NO. 69)**

**I.   INTRODUCTION**

Plaintiffs have brought a claim for violation of the overtime provisions of the Fair Labor Standards Act ("FLSA") and related claims under state law. This Ruling addresses plaintiffs' Motion for Conditional Certification and Court-Authorized Notice Pursuant to Section 216(b) of the FLSA (Doc. No. 69). At the time that Motion was filed, the plaintiffs were Bebi Alli, Eric Kehou, and Patricia Fernandez, three former employees of Boston Market. Since that time, plaintiffs were permitted to amend their Complaint to add two more former employees, Sherrie Ward and Raheim Taylor, as plaintiffs, see Fourth Amended Complaint (Doc. No. 132), and the court granted Boston Market's Motion to Dismiss the claims of plaintiff Alli, see Doc. No. 140. Declarations of the two new plaintiffs were submitted with the briefing on the pending Motion.

Plaintiffs each held the position of Assistant General Manager (AGM), Culinary Manager, or Hospitality Manager at one or more Boston Market restaurants in New York and Connecticut. Boston Market eliminated the positions of Culinary Manager and Hospitality Manager, but continues to employ AGMs at its restaurants across the country. Plaintiffs contend that they were denied legally-mandated overtime pay

1

because Boston Market erroneously categorized all such positions (outside of California) as exempt from the overtime provisions of the FLSA.  Plaintiffs seek conditional certification of a collective action and court-authorization to send notice to current and former AGMs to permit them with an opportunity to join this action.  For the following reasons, plaintiffs' Motion is granted, except with regard to their request for certain information regarding potential opt-in plaintiffs and except with regard to authorization of their proposed notice.

## II.     LEGAL STANDARD

The FLSA permits employees to file an action on behalf of themselves and "other employees similarly situated" for violations of minimum wage and overtime provisions of the FLSA.  29 U.S.C. § 216(b).  "[S]uch a joint, or collective, action requires potential plaintiffs to opt in to the suit in order to benefit from any judgment." Aros v. United Rentals, Inc., 269 F.R.D. 176, 179 (D. Conn. 2010) (quoting Neary v. Metro. Prop. & Cas. Ins. Co., 517 F. Supp. 2d 606, 618 (D. Conn. 2007)).  "Although they are not required to do so by FLSA, district courts 'have discretion, in appropriate cases, to implement [§ 216(b)] . . . by facilitating notice to potential plaintiffs' of the pendency of the action and of their opportunity to opt-in as represented plaintiffs." Myers v. Hertz Corp., 624 F.3d 537, 554 (2d Cir. 2010) (quoting Hoffman-La Roche Inc. v. Sperling, 493 U.S. 165, 169 (1989)) (alterations in Myers).

District courts in this Circuit have generally employed a two-stage process in deciding whether such an FLSA action should proceed as a collective action.  See, e.g., Aros, 269 F.R.D. at 179; Marcus v. American Contract Bridge League, 254 F.R.D. 44, 47 (D. Conn. 2008); Neary, 517 F. Supp. 2d at 618.  The Second Circuit recently

2

approved of this two-step process, see Hertz, 624 F.3d at 554-55, explaining it as follows:

> The first step involves the court making an initial determination to send notice to potential opt-in plaintiffs who may be "similarly situated" to the named plaintiffs with respect to whether a FLSA violation has occurred. The court may send this notice after plaintiffs make a modest factual showing that they and potential opt-in plaintiffs together were victims of a common policy or plan that violated the law. In a FLSA exemption case, plaintiffs accomplish this by making some showing that there are other employees who are similarly situated with respect to their job requirements and with regard to their pay provisions, on which the criteria for many FLSA exemptions are based, who are classified as exempt pursuant to a common policy or scheme. The modest factual showing cannot be satisfied simply by unsupported assertions, but it should remain a low standard of proof because the purpose of this first stage is merely to determine <u>whether</u> "similarly situated" plaintiffs do in fact exist. At the second stage, the district court will, on a fuller record, determine whether a so-called "collective action" may go forward by determining whether the plaintiffs who have opted in are in fact "similarly situated" to the named plaintiffs. The action may be "de-certified" if the record reveals that they are not, and the opt-in plaintiffs' claims may be dismissed without prejudice.

Id. at 555 (quotations and citations omitted; emphasis in original); accord Aros, 269 F.R.D. at 179; Marcus, 254 F.R.D. at 47.

The merits of the plaintiffs' FLSA claim are not directly relevant to the decision whether to certify a collective action. See Aros, 269 F.R.D. at 179. A ruling on a motion for conditional certification "is confined to an analysis of whether [plaintiffs have] shown that the putative collective action members in this case are sufficiently 'similarly situated' as to warrant the case conditionally proceeding as a collective action." Id. "The plaintiffs need not be identically situated to potential class members." Id. at 180

3

(quoting Heagney v. European American Bank, 122 F.R.D. 125, 127 (E.D.N.Y. 1988)). Plaintiffs need only present evidence that "demonstrate[s] similarity among the individual situations . . . some identifiable factual nexus which binds the named plaintiffs and the potential class members together as victims" of a common policy or scheme. Aros, 269 F.R.D. at 180 (quoting Heagney, 122 F.R.D. at 127).

### III.  DISCUSSION

#### A.  Evidence of Common Job Functions and Common Classification

The evidence indicates that there is no relevant difference between the three positions at issue here:  the AGM, the Culinary Manager, and the Hospitality Manager. Boston Market's Director of Operations, Robert Gerard, testified that Culinary Manager and Hospitality Manager were two job titles that Boston Market has eliminated and that these positions are the same as the current AGM position.  Gerard Dep. (Pl. Ex. A) at 36-37 (Q. "What is a culinary manager?"  A. "That was an assistant general manager in the structure that I referred to . . . ." Q. "What is a hospitality manager?"  A. "That would be the same thing."); see Alli Dep. (Pl. Ex. B) at 138 (testifying that all three job titles had the same responsibilities); Kehou Dep. (Pl. Ex. C) at 40 (testifying that there was no difference between his responsibilities as a culinary manager and as an AGM).

The testimony and declarations of the plaintiffs—some of whom worked at multiple Boston Market restaurants—indicate that they had consistent responsibilities in each of these positions in various Boston Market restaurants in Connecticut and New York.  See Ward Decl. (Pl. Ex. R) ¶ 10 ("In every store that I worked in as an AGM or Hospitality Manager at Boston Market, I spent 90-95% of my work time performing manual labor and customer-service tasks. These duties included . . . cleaning ovens,

4

cleaning water baths, mopping floors, cooking food, making sandwiches, taking orders for guests, cashiering, serving food, cleaning the dining room . . . . This was consistent at each store where I worked."); Taylor Decl. (Pl. Ex. S) ¶¶ 7-8 ("I spent about 90% of my work time performing manual labor and customer-service duties such as: cooking chicken, . . . making sandwiches, . . . working the cash register, serving customers, mopping the dining room . . . . My job duties were basically the same in each store where I worked, even though some stores were larger or busier than others."); Alli Dep. (Pl. Ex. B) at 93-94, 137-38 (testifying that, across the various restaurants, zero to ten percent of her responsibilities were managerial and the majority was "[t]he same grunt work, filling in all the positions, cooking, cleaning, washing the walls . . . cashiering, cleaning . . . ."); Kehou Dep. (Pl. Ex. C) at 169-70, 172 (testifying that his responsibilities included preparing food, cleaning equipment, and sweeping and mopping floors).

  Boston Market scripted a checklist, entitled the "Simple Disciplines Travel Path," which outlines a routine that AGMs are expected to perform repeatedly throughout the day. Pl. Ex. T; see Gerard Dep. (Pl. Ex. A) at 114-15. The document contains a detailed list of nearly 80 items or tasks to perform throughout the restaurant, such as checking that the parking lot is free of trash and that bathroom air fresheners are in place, and to correct any item found to be out of place. See Pl. Ex. T. This Travel Path provides strong evidence that, from restaurant to restaurant, the AGM position involves similar responsibilities, dictated by uniform corporate policy. Boston Market's Director of Operations testified that the Simple Disciplines Travel Path is

> the routine that we expect our managers to follow within the restaurant. So, if the travel path would start from the outside, work their way into the dining room, look at your

> dining room, make sure that its clean, work your way into the restroom, work your way down the front and back line throughout the entire restaurant, so you can see what is exactly happening in your restaurant. A travel path should happen at least minimally once every 30 minutes.

Gerard Dep. (Pl. Ex. A) at 114-15. Plaintiffs assert that they were expected to perform the tasks on the Travel Path on a routine basis at each of the different restaurants where they worked. See Ward Decl. (Pl. Ex. T) ¶ 12; Taylor Decl. (Pl. Ex. S) ¶ 10.

Boston Market's training and orientation policies provide further indication that the positions at issue are highly consistent, if not uniform, from restaurant to restaurant. First, Boston Market ensures that all restaurant employees receive a uniform orientation, because it "wouldn't want the general managers going off and creating their own orientation . . . ." Gerard Dep. (Pl. Ex. A) at 82. At orientation, each employee is given the "employee guidelines," which includes information on company expectations and policies for employees. See id. at 75-77. Gerard testified that the purpose of these guidelines are to "make sure that we are consistent from restaurant to restaurant in the standards that are in here." Id. at 80-81. Second, Boston Market utilizes a standardized eight week training program for new AGMs, promulgated at the corporate level, and conducted only by certified trainers at specific, certified training restaurants. Id. at 103-06. Significantly, after this initial training, AGMs can move from one Boston Market restaurant to another without any retraining. See id. at 180-81; Ward Decl. (Pl. Ex. R) ¶ 20 ("I did not need any additional training for any of the seven times that I moved to a new store."); Taylor Decl. (Pl. Ex. S) (no retraining needed for work at four different stores) ¶ 17.

Finally, the foregoing evidence that AGMs have similar responsibilities from one

restaurant to another is supported by evidence that, as a general matter, Boston Market restaurants across the country are managed according to uniform policies. Boston Market's Director of Operations testified that the company maintains uniform guidelines for its restaurants because "[i]t is important that we have the same food quality and guest experience from restaurant to restaurant. . . . [T]he guests wouldn't know what to expect if they went from the one in California to the one in New York, if it were different." Gerard Dep. (Pl. Ex. A) at 85. These policies control food safety, food handling and food preparation at all Boston Market restaurants. See id. at 82-84; Pl. Ex. H (Boston Market "Daily Food Safety Checklist"); Pl. Ex. I (Boston Market "Daily Prep Sheet"); Pl. Ex. J (Boston Market "Daily Prep Sheet Explained"); Pl Ex. K (Boston Market "Standard Operating Procedures: Proteins"). Boston Market also imposes uniform, step-by-step procedures for opening and closing of stores and for handling of cash. See Pl. Ex. M (Boston Market guidelines for "Security at Opening" and "Security at Closing"); Gerard Dep. at 100-01 (testifying that the opening and closing procedures apply at all restaurants). Neither AGMs, nor even general managers, have authority to deviate from these standard procedures. See Gerard Dep. at 93-94,185-86; see also Pl. Ex. N (May 11, 2007 Memorandum to hospitality and culinary managers). Boston Market also utilizes a "Manager's Travel Path"—similar to the "Simple Disciplines Travel Path"—which contains both a checklist of tasks and a timeline, entitled "A Day in the Life of Boston Market," which proscribes a list of tasks to be performed at specified time intervals during the day. Pl. Ex. U. All of these standard policies and protocols support the general conclusion that Boston Market restaurants are run in a uniform fashion dictated by corporate headquarters. This is consistent with the more specific evidence

that the job responsibilities of AGMs, Culinary Managers, and Hospitality Managers, are substantially similar from one Boston Market restaurant to another.

In response, Boston Market argues that the plaintiffs' experience is limited to Boston Market restaurants located in New York and Connecticut, and that it is inappropriate to infer that AGMs in other states have similar responsibilities. Boston Market cites Vasquez v. Vitamin Shoppe Indus., where a court rejected certification because the "only evidence" of a uniform, nationwide misclassification was plaintiff's "observations of and conversations with six [store managers], all of whom work at store locations in Brooklyn or Manhattan." No. 10-cv-8820 (LTS), 2011 WL 2693712, *3 (S.D.N.Y. July 11, 2011). Here, however, plaintiffs' evidence of uniform corporate policies, standardized training and orientation, and corporate job routines for AGMs, such as the opening and closing protocol and the Travel Path checklists, all pertains to Boston Market restaurants across the country. These documents support a conclusion that the similarities observed by plaintiffs in New York and Connecticut restaurants are likely to exist in other restaurants throughout the Boston Market chain. This is sufficient at the conditional certification stage.

Boston Market also submits declarations from current AGMs, who indicate that they perform tasks and responsibilities that differ from those performed by the plaintiffs. This court has refused to consider such evidence at the conditional certification stage, holding that it is more appropriately considered at the second stage of the certification process. See Aros, 269 F.R.D. at 180 ("[I]t is inappropriate to consider the declarations of other United Rentals employees, which have been submitted to the court by United Rentals in an effort to prove that the potential collective action members are not

8

similarly situated."); Neary, 517 F. Supp. 2d at 620 ("Several courts have stated . . . that disparate factual and employment settings of the individual plaintiffs should be considered at the second stage of analysis." (quotation omitted)).  "[C]onditional certification depends not on whether the potential collective action members are in fact 'similarly situated,' but on whether [plaintiffs have] made 'a modest factual showing sufficient to demonstrate that [they] and potential plaintiffs together were victims of a common policy or plan that violated the law.'"  Aros, 269 F.R.D. at 180 (quoting Neary, 517 F. Supp. 2d at 618).

Here, plaintiffs have met their modest burden of submitting evidence that AGMs, Hospitality Managers, and Culinary Managers perform similar work at each of Boston Market's restaurants.[1]  As for the showing of a common policy, Boston Market does not dispute that it has uniformly categorized all AGMs, Hospitality Managers, and Culinary Managers outside of California as "exempt" from the overtime provisions of the FLSA.[2] See Boston Market Opp. at 30-31 (arguing that Boston Market's uniform exemption of all AGMs is insufficient to support certification).  Notably, although Boston Market argues that there is evidence of differences between the jobs performed by AGMs,

---

[1] Because the court finds that the evidence discussed above to be sufficient, the court does not address the parties' dispute over the relevance of Boston Market's uniform job description for AGMs.  See Gerard Dep. (Pl. Ex. A) at 35-36 (testifying that Boston Market prepared a uniform description of the core responsibilities of AGMs); see also Pl. Ex. Q (12 internet job announcements for AGM positions at Boston Market restaurants in various states and cities describing the job in the same terms).  Although plaintiffs apparently intended to do so, they have not submitted a copy of the uniform job description described in Gerard's testimony.   Plaintiffs describe their Exhibit P as a copy of that job description, but as filed, that exhibit consists of four pages with nothing other than the Boston Market logo and a truncated sentence of no import.  See Pl. Ex. P (Doc. No. 71-16).

[2] As proof of this classification, plaintiffs cite their misfiled Exhibit P.  See supra at 9, n.1.  The court therefore relies on Boston Market's failure to contest that AGMs were classified as exempt as a matter of general policy, regardless of any case by case assessment of the work done by individual AGMs.

Boston Market does not contend that it considers those differences or makes any case-by-case determination of whether to classify particular AGMs as exempt. The evidence is sufficient to satisfy plaintiffs' modest initial burden of submitting evidence that there are other similarly situated plaintiffs who have been subject to the same common policy.[3]

Therefore, pursuant to Section 216(b) of the FLSA, the court conditionally certifies a collective action on behalf of AGMs, Culinary Managers, and Hospital Managers who worked at a Boston Market restaurant, outside of California, between January 4, 2007 and the present. The court finds that it is appropriate that notice be sent to these potential opt-in plaintiffs.

### B. Boston Market's Objection to Disclosure of Phone Numbers and Social Security Numbers

Plaintiffs have requested that, for purposes of providing notice, Boston Market be ordered to produce the names, mailing addresses, telephone numbers, social security numbers, work locations, and dates of employment of potential opt-in plaintiffs. Boston Market objects to the request for phone numbers and social security numbers.

Notice by mail is appropriate, and courts routinely order production of names and mailing addresses for potential opt-in plaintiffs. See Gayle v. Harry's Nurses Registry,

---

[3] Boston Market submitted a Notice of Supplemental Authority which seeks to draw some support from two cases decided under the standard for certification of a class action under Fed. R. Civ. P. 23: the Supreme Court's recent decision in Wal-Mart Stores, Inc. v. Dukes, --- U.S. ---, 131 S. Ct. 2541 (June 20, 2011), and a district court decision, Cruz v. Dollar Tree Stores, No. 07-2050 SC, 2011 WL 2682967 (N.D. Cal. July 8, 2011). In doing so, Boston Market disregards the fact that the issue raised by the pending Motion for Conditional Certification "is quite distinct from the question whether the plaintiffs have satisfied the much higher threshold of demonstrating that common questions of law and fact will 'predominate' for Rule 23 purposes . . . ." Myers, 624 F.3d at 556 (emphasis added). Assuming for the sake of argument that these Rule 23 cases might provide some guidance in FLSA collective action cases, they do not alter the standard applicable at the initial, conditional certification stage. See id. Until the potential plaintiffs receive notice and decide whether to opt-in, the court should not and will not decide whether the case actually ought to be resolved as a collective action. See id. at 555.

Inc., 07-cv-4672(CPS), 2009 WL 605790, *11 (E.D.N.Y. March 9, 2009) (citing cases). Plaintiffs have shown no need for the disclosure of telephone numbers and, especially, social security numbers. See, e.g., id. at *11 ("[P]laintiff has not made a showing that disclosure of confidential social security numbers is necessary in order to facilitate the delivery of notices."); Delgado v. Ortho-McNeil, Inc., No. 8:07-cv-263, 2007 WL 2847238, *3 (C.D. Cal. Aug. 7, 2007) ("[P]roduction of telephone numbers, email addresses, and social security numbers is inappropriate."). Therefore, Boston Market shall produce the requested information, except for the social security numbers and telephone numbers. Plaintiffs may renew their request for telephone numbers if further information indicates that the addresses are inadequate. See Houston v. URS Corp., 591 F. Supp. 2d 827, 836 n.9 (E.D. Va. 2008) (denying request for telephone numbers except to "the extent the notice mailed to putative collective action members is returned undeliverable").

### C. Boston Market's Objection to the Proposed Notice

Boston Market makes a general objection to the proposed notice submitted with plaintiffs' Motion (Doc. No. 69-1). However, Boston Market does not identify any specific problems with that notice. Boston Market shall have 14 days to confer with plaintiffs' counsel and submit a mutually agreed upon notice or, failing that, to submit simultaneous briefing, within 21 days of the date of this Ruling, as to its specific objections together with its own proposed notice. See Aros, 269 F.R.D. at 186.

However, the court notes that the plaintiffs' proposed notice provides that the cut-off date for class membership (i.e., the date at which a potential class member must have been working at Boston Market) is to be determined by the court. In their

Memorandum, plaintiffs requested a date of January 4, 2007. Pl. Mem. at 25. The court has adopted this proposed date based on the absence of objection. Thus, although the court is providing an opportunity for objection to the proposed notice, the court does not intend to entertain any objection, such as an objection to this date, that would involve relitigating the scope of the conditionally-certified class.

## IV. CONCLUSION

For the foregoing reasons, plaintiffs' Motion for Conditional Certification and Court-Authorized Notice Pursuant to Section 216(b) of the FLSA (Doc. No. 69) is **granted in part**. The court conditionally certifies the collective action class. The court orders the defendants to produce the requested information regarding potential opt-in plaintiffs, except for telephone numbers and social security numbers. The court approves the sending of notice to the potential opt-in plaintiffs. However, pending further agreement within 14 days, or further objection within 21 days, the court does not authorize the mailing of plaintiffs' proposed notice in its present form.

**SO ORDERED.**

Dated at Bridgeport, Connecticut, this 8th day of September, 2011.

      /s/ Janet C. Hall
Janet C. Hall
United States District Judge